# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-00369-COA

**DEVIN PIERCE JOHNSON**                                   **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                   **APPELLEE**

DATE OF JUDGMENT:            03/06/2023
TRIAL JUDGE:                 HON. MARK SHELDON DUNCAN
COURT FROM WHICH APPEALED:   LEAKE COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:      OFFICE OF STATE PUBLIC DEFENDER
                             BY: W. DANIEL HINCHCLIFF
ATTORNEY FOR APPELLEE:       OFFICE OF THE ATTORNEY GENERAL
                             BY: LAUREN GABRIELLE CANTRELL
DISTRICT ATTORNEY:           STEVEN S. KILGORE
NATURE OF THE CASE:          CRIMINAL - FELONY
DISPOSITION:                 AFFIRMED - 02/18/2025
MOTION FOR REHEARING FILED:

> **EN BANC.**
>
> **McCARTY, J., FOR THE COURT:**

¶1.     A man was home alone with three children.  Over the course of the next thirty-six hours, a one-year-old suffered injuries so serious they resulted in his death.  A four-year-old suffered broken bones.  After an investigation, the man was indicted for capital murder and felony child abuse.  Following a jury trial, he was found guilty.  On appeal, he claims his counts should have been severed and tried separately.  Finding no error, we affirm.

## FACTS

¶2.     Devin Johnson was in a relationship with his longtime girlfriend Emilia Farmer.  On April 29, 2020, Emilia was at the hospital in labor.  Johnson was left home alone with

Emilia's three children, including one-year-old Drew and four-year-old Anna.[1]

¶3.     Later that evening, at Emilia's request, her mother, Trudy, stopped by the home to pick the children up.  But Johnson assured her that his mother, Connie Charlie,[2] was going to take care of the children for the evening when he went to work.

¶4.     Trudy saw Drew "laying on the couch" and noticed it looked "like he [had been] crying for hours . . . [and] was trying to catch his breath."  Johnson told her that Drew had fallen "down and bumped his head so [he] gave him Benadryl."  Before leaving the house, Trudy asked to see Anna and noticed a bruise on her face.  Despite what she saw, Trudy left the house.

¶5.     An hour or two later, Connie and Robert Lee Tubby, Johnson's cousin, picked up Johnson and the children from the home and took Johnson to work.  Tubby heard Johnson tell his mother that "the kids were playing around the on the couch . . . [and] that a weight fell on [Drew]."  Drew was then carried to Tubby's car and placed inside.  Although Drew did not talk or make any noises during the car ride, "he was crying."

¶6.     After dropping Johnson off, Tubby dropped off Connie and the children at Connie's house and left minutes later.  Tubby would later testify that after he left, Connie called him and informed him that an ambulance was called to take Drew to the hospital "because his face was turning blue."

¶7.     Subsequently, Leake County Deputy Randy Bell received a "call of an unresponsive

---

[1]  To protect the identity of the minor children, we use pseudonyms.

[2] Connie was deceased at the time of trial.

2

child" and responded to Connie's house. By the time Deputy Bell arrived on scene, Drew had already "been transported to Baptist Leake Hospital by paramedics." Connie disclosed to Deputy Bell that once she got back to her house with the children, Drew was "placed [] on the bed because he was still asleep." Then, sometime after 10 p.m., Johnson's brother found Drew "unresponsive in the bed," saw "he had purple lips," and called 911.

¶8.    At some point while Deputy Bell was still on scene, Johnson arrived back from work. Deputy Bell took a statement from Johnson, who explained that earlier in the day "he heard a thud come from the living room where the children were" on his way to the restroom. Johnson "walked into the living room, and [saw Drew] laying on the floor beside a weight." He picked Drew up because he "was crying" and then "laid him on a couch in the living room, covered him up with a blanket, and told him it was going to be all right." After a while, Drew "finally quit crying and whimpering and went to sleep." In attempting to explain Drew's injuries, Johnson told Deputy Bell "that the siblings would often play rough with [him]," which could have caused them.

¶9.    After receiving a call from Connie informing her Drew was taken to the hospital, Trudy Farmer and her other daughter went to Connie's house to pick up Anna and the third child. Trudy would later testify that Anna "was scared" and "crying" when she saw her, and when Trudy attempted to touch Anna, "she screamed and hollered saying it hurts; it hurts." Before Trudy could make it to the hospital, Drew died.

¶10.    Johnson was then transported to the Leake County Sheriff's Office to speak with an investigator. Investigator Billy McMillan conducted two interviews with Johnson, twenty-

3

four hours apart. Johnson was subsequently indicted for one count of capital murder with the underlying felony of felonious child abuse and/or battery against Drew and one count of felony child abuse against Anna.

**PROCEDURAL HISTORY**

¶11. Prior to trial, Johnson filed a written motion to sever the two counts against him, but he never sought a hearing or ruling from the trial court before trial. However, on the day of trial, and after jury selection was completed, Johnson re-raised the severance issue before the trial court. Through counsel, he requested that the trial court sever the two counts because it was "unclear from the discovery if the State alleged in their indictment [that the offenses] occurred at the same time," or that there was a "series of commonality between the two instances."

¶12. Emphasizing that in order "[t]o properly have a hearing on [the motion to sever], we should have done that sooner," the trial court denied Johnson's request. The trial court further noted that the State "alleged in its indictment that the two crimes were part of a common scheme [or] plan," and that it was "up to them to prove that."

*The Trial*

¶13. The State called six witnesses at trial. The jury heard from Johnson's cousin Tubby first. His testimony centered largely around his observations while he and Connie picked Johnson and the children up from Johnson's house on the night of the incident.

¶14. The State called the children's grandmother, Trudy Farmer, who recounted to the jury what she saw when she arrived at Johnson's house to pick her grandchildren up on April 29.

4

After Johnson told her Drew fell off the couch and she saw Anna's bruised face, Trudy testified that she offered to take the children to the hospital, but Johnson declined the offer.

¶15.    After receiving a call from Connie around 9:30 that evening that "[Drew was] not breathing," Trudy testified that she and her other daughter headed to Connie's house. Once the two arrived, Trudy recounted Anna's demeanor—that she "was scared" and "crying" and in pain. She explained to the jury that she was concerned at this point because "it's not like [Anna] not to want to see [her]."

*Law Enforcement Testimony*

¶16.    Then, Billy McMillan, an investigator for the Leake County Sheriff's Office at the time of the incident testified. Investigator McMillan testified that after receiving a report of an unresponsive child, he went to the Baptist Leake emergency room to begin his investigation. After arriving at the hospital  and observing Drew "laying on the [hospital] bed deceased[,]" Investigator McMillan "[t]ook . . . pictures of the bruises all over the baby's body" before heading to the sheriff's office to interview Johnson. The investigator disclosed that Drew had "[b]ruises on his chest area, arms, and head," as well as "on his face." Without objection, all five photographs Investigator McMillan took of Drew were entered into evidence and published to the jury.

¶17.    Investigator McMillan recounted his first interview with Johnson to the jury. He testified that after Johnson waived his *Miranda* rights,[3] Johnson told him that the bruises all over Drew's body were because "the other kids always played rough with him" and that "the

---

[3] *See Miranda v. Arizona*, 384 U.S. 436, 439 (1966).

day before [Drew's death] [Johnson] had seen one of the kids hit [him] with a net." Offering further explanation, Johnson told the investigator that he spanked Drew "on his butt and legs" the day of the incident, which "could have caused some of the bruises."

¶18. After Investigator McMillan inquired into the bruises on Drew's face, Johnson explained that he "fell off a couch and hit the [kettlebell] weight that was on the floor." Further inquiring into the bruises on Drew's back and stomach, the investigator testified that Johnson disclosed that "he was cooking supper" on the day of the incident and "found [him] playing in the commode" and he "was laying on the commode seat with his stomach face down, and his legs were dangling." Johnson walked in and "popped [him] two or three times on his back," which he explained could have caused the bruising on Drew's back and stomach. Johnson also added that after he removed Drew from the commode, "[his] hair [wa]s wet," so he gave Drew a towel to dry his head, explaining that "[his] head could have hit the commode at that time causing the bruise on his head."

¶19. When asked by the investigator if he was concerned about the child at any point, Johnson disclosed that "[h]e was concerned . . . . He did not think [Drew] was okay." However, Johnson told Investigator McMillan that he refrained from taking Drew to the hospital "because he didn't want the people [there] to accuse him of abuse."

¶20. Investigator McMillan testified that he was informed Anna was taken to the "hospital for possible abuse" as a result of the "bruises on her head, arm, and hip" during his first interview with Johnson. When asked about Anna's bruises, Johnson told the investigator that he "had to get onto [Anna] a couple of times" the day before the incident. Johnson told

6

Investigator McMillan that "he was cooking breakfast" and "[Anna] took her food and put it in the garbage can." Johnson "got mad" and made Anna retrieve the food from the garbage. According to Johnson, Anna "threw the plate on the counter," which made him mad again, so he "started whooping her."

¶21. Attempting to explain how Anna developed her bruises, Johnson told the investigator that "as he was whooping her, she dropped down on one leg," which "caus[ed] him to hit her in the face." Continuing on, Johnson disclosed that "[a]s [Anna] went down to one knee, he grabbed her up under her arm, which straightened her arm out," which he asserted is "probably what hurt her arm." Investigator McMillan testified that at this point in the interview, he had not yet learned that Anna's clavicle was broken.

¶22. A second interview of Johnson was conducted by Investigator McMillan approximately "a day and a half later." The investigator testified that Johnson again waived his *Miranda* rights and had much of the same answers he did in his first interview. However, Investigator McMillan told the jury that during his second interview of Johnson, Johnson disclosed that "about two months ago he popped [Drew] on top of the head[,]" but that instance had been "the only time he ever hit [him] in the head." Johnson also offered a few more explanations as to how Drew sustained his injuries.

¶23. The first new explanation Johnson provided the investigator—specifically for Drew's head injury—was that the child "was climbing on a walker . . . to climb on top of a counter and fell . . . [and] hit the wooden bench with his head." Then, Investigator McMillan testified that Johnson told him Drew "pulled the TV off the dresser or off the shelf," and

7

when he "walked in the bedroom, the TV [wa]s laying on the baby's thigh," and Drew was "on the ground." Johnson explained how he grabbed Drew "by his arm" and "thr[e]w[] him to the mattress . . . [but] his head hit[] the wall." The investigator disclosed that Johnson claimed this could have caused Drew's skull fracture. Johnson told Investigator McMillan that after this happened, the one-year-old "had difficulty walking" and "was unstable." All told, by the end of his second interview, Johnson provided the investigator eight different explanations as to what could have caused Drew's injuries.

*Medical Findings and Opinions*

¶24. Mark LeVaughn, the state medical examiner was called to testify for the State as well. Dr. LeVaughn was accepted as an expert in the field of forensic pathology by the trial court. After describing the general procedure for conducting an autopsy, Dr. LeVaughn clarified that its ultimate purpose is to determine a patient's cause and manner of death. He further explained to the jury that the "cause of death is how the person died" and is usually delineated in terms of "general categories." Then, once a cause of death has been determined, the manner of death can be determined. Dr. LeVaughn explained that this focuses on "the why . . . [or] how the cause of death came about or occurred." He also highlighted that "there are only five manners of death that . . . can [be] assign[ed] to a patient."[4]

¶25. Dr. LeVaughn told the jury that during his external examination of Drew he noticed "bruises on the right side of the face" and "bruises in the oral cavity, the lips, [and] the little

---

[4] According to Dr. LeVaughn, the five manners of death attributable to a patient are: natural, accident, homicide, suicide, and undetermined.

8

piece of tissue that hangs from the top, [called] the frenulum." He also found "an abrasion and contusion of the left side of the chest" in addition to "two areas of contusion on the back, upper, and mid back" and "two areas of contusion on the back of the right leg." Dr. LeVaughn explained that Drew suffered "systemic injuries" because they were inflicted "all over the [entire] body." When asked how a one-year-old might sustain such injuries, Dr. LeVaughn testified that although he could not say "what exactly caused [Drew's] injuries[,]" the pattern he observed was "not a natural thing . . . [or] normal finding on a child."

¶26. Then, Dr. LeVaughn walked the jury through his internal examination of Drew. Disclosing that Drew had "significant injuries to the head[,]" Dr. LeVaughn specified that he found "bleeding under the scalp tissue on both sides of the head," "skull fractures on the right side of the head," "two types of hemorrhages on the surface of the brain," and "the brain was swollen." Because "[t]here was bleeding on the surface of [Drew's] skull[,]" and the blood "was still liquid blood," Dr. LeVaughn concluded that these were "very recent injuries" since "[the blood] didn't have any time to clot or coagulate." Based on his findings from both examinations of Drew, Dr. LeVaughn opined that the child suffered "at least two injuries to the head." He specifically addressed the "severity" of Drew's skull fracture, informing the jury that it "was lethal," likely rendering him "immediately unconscious." Dr. LeVaughn testified that this was the "injury [that] killed th[e] child."

¶27. Although he was unable to determine the order in which Drew's injuries were inflicted, Dr. LeVaughn disclosed that "these injuries all occurred about the same time." He further stated that because Drew suffered "multiple blunt injuries," such harm "could be

9

considered a beating." Dr. LeVaughn also made clear to the jury that the bruises covering Drew's body could not be caused by one single hit, stating "[a]ll of these injuries required multiple impacts." Ultimately, Dr. LeVaughn concluded that Drew's cause of death was "multiple blunt trauma" and that his manner of death was "homicide."

¶28. Lastly, the State called Bruce Sabatino, the doctor on call in the emergency room the night Drew was brought in. Dr. Sabatino was accepted as an expert in the field of emergency medicine by the trial court. He told the jury that Drew was "brought into the emergency department by ambulance . . . in full cardiopulmonary arrest," meaning his "heart and lungs . . . completely stopped functioning." Although Drew was "very quickly" hooked up to what would normally be life-saving machines and CPR was administered, Dr. Sabatino testified that the child "had actually been in asystole," or flatline, "for a good 40 minutes before he even got to the emergency department" and remained that way despite "what we could do for him mechanically. . . ." Drew was "declared deceased about six minutes" after arriving at the hospital.

¶29. Dr. Sabatino conducted a physical examination of Drew and observed that "[h]e had a very large hematoma," or collection of blood, "on the parietal area and temporal area of his scalp." "[C]ontusions or black and blue marks" were also present on the "right side of [Drew's] face," which was "noticeably more swollen compared to the left side." Drew also "had bruising to the earlobe and the area inside the ear on his right side," and "a condition called hemotympanum" or "blood on the other side of the eardrum." Dr. Sabatino emphasized that the presence of a hemotympanum is "a clear indication of [a] skull fracture."

10

¶30. The doctor also observed that Drew "had multiple abrasions over many, many different areas of his body," including on his back and "on the left side of his chest and upper abdomen." When asked if he could determine a time frame in which Drew sustained his injuries, Dr. Sabatino testified that rather than looking like "old injuries," they looked "acute" or "happening suddenly and within [a] very recent time frame." He further stated that it was "just completely, totally unlikely—totally unlikely that from a simple fall onto a single hard object that all these different patterns of injuries would result." Because "[t]his case had all of the markings or characteristics of child abuse," Dr. Sabatino disclosed that an autopsy was ordered.

¶31. After disclosing to the jury that he also saw Anna in the emergency room that night, Dr. Sabatino went on to explain her condition. Although Anna was "walking [and] talking" and "didn't appear to be in any physical distress," she "had some black and blue marks on the left side of her face." The doctor testified that when he asked Anna where the bruises on her face came from, she told him that "somebody [was] throwing around a toy . . . on a string or something" and the toy hit her in the cheek. Anna refused to tell him who was throwing or swinging the toy around.

¶32. Dr. Sabatino also recalled that Anna was "holding her arm sort of applied . . . against her chest, not wanting to move the right shoulder." Although an x-ray was ordered, Dr. Sabatino disclosed that it was a CAT scan that "found a mid to distal non-displaced, closed fracture of [Anna's] clavicle," which "just means that the skin is not broken." Anna told Dr. Sabatino that this injury was a result of her being "pushed into a corner" but again refused

11

to disclose the person responsible for injuring her. Dr. Sabatino testified that he was "very suspicious about child abuse in this case" based on the discrepancies between what Anna told him and what he observed as a clinician. The State rested its case-in-chief.

*Defense's Motion for a Directed Verdict*

¶33. The defense subsequently moved for a directed verdict on both counts, arguing that the State failed to present a prima facie case of capital murder of Drew and felony child abuse of Anna. Through counsel, Johnson further requested that the trial court "grant a mistrial" as he "had made the [c]ourt aware that there was a motion filed regarding severance of the two matters." Focusing on "how closely related these two incidents [were]," Johnson argued that the only testimony the State presented relating to the children's injuries "occurred one day apart," and therefore, "these matters should have been tried separately and not together."

¶34. Viewing all of the evidence in the light most favorable to the State, the trial court found that the "State ha[d] made out its prima facie case on each count" and denied Johnson's motion for a directed verdict. Further, in addressing the severance issue, the trial court found that although the two events may not have occurred "simultaneously to each other," the evidence suggested they occurred "basically [at] the same time, the same place, and involving the same people." Recognizing that this "constitut[ed] a series of acts that are connected together, which is exactly [what] is contemplated by the multi-count statute," the trial court denied Johnson's motion for a mistrial.

*The Defendant's Trial Testimony*

¶35.     Johnson then testified in his own defense.  Throughout the entirety of his testimony, Johnson adamantly denied intentionally harming Drew or Anna, and he repeatedly claimed that Investigator McMillan "manipulat[ed]" the answers he gave during his interviews. Johnson told the jury that Drew fell and hit his head on the kettlebell "[l]ike 15 minutes before [he] went to work" on Wednesday, but that he did not see it happen because he was in the bathroom at the time.  Drew "was crying[,]" so Johnson recounted how he "quickly picked him up and told him he was going to be okay" and then "put him on the couch."

¶36.     When asked to explain the breakfast incident with Anna to the jury, Johnson testified that after preparing the kids' food, he heard a noise in the kitchen.  Johnson said Anna threw her plate of food in the trash, and after he asked her to remove the plate, Anna "slammed it in the sink."  Johnson then took Anna to her room.  He testified:

> Johnson:     And then when I took her to the room – I said, "Normally I would pull your pants down and spank you, but by your mom not being here, I'm not going to do that.  I'm just going to spank you a couple times and that would be that.  You know why this happens. Right?"  And she said, yeah.  "I'm not trying to do this to be harming you, it's because I love you.  I don't want you to be rude or disrespectful like this."  So, you know, I spanked her.
>
> Defense:     Okay.  Did you tell the officer that when you were spanking her she went down to one knee and you hit her on the side of the face?
>
> Johnson:     See, that's not even a true statement about that.  I grabbed her underneath the armpit.  And I didn't hold on to her.  I just had her like this.  And then when I popped her the first time or spanked her, that's when she was trying to go down.
>
> I said, no, [Anna], don't do that.  And then when I was fixing to go like this, that's when my hand was already going down like this.  Her body kind of slid off my arm, and that's where I

13

accidently smacked her.

¶37.    On cross-examination, Johnson was shown multiple pictures of Drew and his injuries and was then asked how those injuries occurred.  Each time, Johnson responded, "I don't know."

¶38.    Multiple times throughout his testimony, Johnson claimed that Investigator McMillan "manipulat[ed]" his answers or made them up completely.  Johnson explained to the jury that he told Investigator McMillan the reason he did not take Drew to the hospital was not because he was worried hospital employees might suspect him of abuse, but because he was "on a thin line of points" at work.  He disclosed that his job conveyed to him that if the reason an employee missed work did not have "to do with COVID . . . [he was] going to lose [his] job."  Johnson testified that he "wanted to go talk to [his] supervisor about that" and Investigator McMillan "took that as – saying I didn't want" to take Drew to the hospital.

¶39.    Ultimately, the jury found Johnson guilty of both counts: capital murder of Drew and felony child abuse of Anna.  He was sentenced to life imprisonment without eligibility for parole for his capital murder conviction and twenty years for his felony child abuse conviction, with the latter set to run consecutively to the life sentence.  The trial court denied his motion for a new trial.  Johnson now appeals, raising only one issue through counsel.

**STANDARD OF REVIEW**

¶40.    "We employ an abuse-of-discretion standard when reviewing a trial court's denial of a motion to sever a multi-count indictment."  *Donaldson v. State*, 262 So. 3d 1135, 1164 (¶122) (Miss. Ct. App. 2018).  "When a motion to sever is made, the State bears [the] burden

14

of making out a prima facie case showing the offenses charged are within the language of the statute." *Harper v. State*, 102 So. 3d 1154, 1158 (¶9) (Miss. Ct. App. 2012) (citing *Corley v. State*, 584 So. 2d 769, 772 (Miss. 1991)). It is "*recommend*[*ed*] that [the] trial court hold a hearing on the issue." *Corley*, 584 So. 2d at 772 (emphasis added). After the State meets its burden, a defendant may rebut "by showing the offenses were separate and distinct acts or transactions." *Donaldson*, 262 So. 3d at 1164 (¶122).

## DISCUSSION

### The motion to sever Johnson's counts was properly rejected.

¶41. Johnson raises only one issue on appeal, but suggests two reasons in support of his argument. He argues that the trial court erred by failing to sever the two counts listed in his indictment because the trial court failed to "conduct[] a pre-trial hearing on severance" and "the evidence failed to show a common scheme or plan."

¶42. The first part of Johnson's argument focuses on a perceived error of the trial court in its lack of conducting a pre-trial hearing on his motion to sever the two counts against him.

¶43. Mississippi Rule of Criminal Procedure 14.3(b) requires that "[a] defendant's motion to sever offenses . . . be made at the earliest opportunity." "[I]f a proper motion is not timely made," then the defendant's "right to move for severance may be deemed to have been waived[.]" *Id.*

¶44. Crucially, "[i]t is the *duty of the movant* . . . to pursue the motion to hearing and decision." MRCrP 34.2 (emphasis added). A defendant's "[f]ailure to pursue a pretrial motion to hearing and decision before trial is deemed an abandonment of that motion[.]" *Id.*;

*see also Smith v. State*, 986 So. 2d 290, 296 (¶16) (Miss. 2008) (recognizing "it is the responsibility of the movant to obtain a ruling from the court on motions . . . and failure to do so constitutes a waiver") (quoting *Evans v. State*, 725 So. 2d 613, 708 (¶455) (Miss. 1997)). Nonetheless, "the motion may be heard after the commencement of trial" subject to the trial court's discretion. MRCrP 34.2.

¶45. Our Rules and caselaw make clear that it is Johnson's responsibility—and his alone—to pursue his pre-trial motion to ruling. While Johnson initially moved to sever his counts, the record reflects that he failed to "pursue the motion to hearing and decision." *Id*. Indeed, Johnson waited until the day of trial and after jury selection was completed to re-raise his severance motion before the trial court. Because Johnson failed to meaningfully pursue his severance motion and obtain a ruling from the trial court, he abandoned the motion, and it is waived on appeal. *Smith*, 986 So. 2d at 296 (¶16); MRCrP 34.2.

¶46. Notwithstanding this waiver, we recognize the trial court nonetheless exercised its discretion and heard the severance motion "after the commencement of trial" pursuant to Mississippi Rule of Criminal Procedure 34.2. We cannot say the trial court abused its discretion in denying Johnson's request for severance since it proceeded to the merits.

¶47. But even if Johnson had not abandoned and waived his claim for severability, the trial court was still within its discretion to deny it. Mississippi law allows for a defendant to be charged with multiple offenses in a single indictment if "(a) the offenses are based on the same act or transaction; or (b) the offenses are based on two (2) or more acts or transactions connected together or constituting parts of a common scheme or plan." Miss. Code Ann.

16

§ 99-7-2(1) (Rev. 2020).

¶48.　Our Supreme Court has addressed three factors a trial court should consider when making its determination regarding severance:

> [(1)] whether the time period between the occurrences is insignificant[; (2)] whether the evidence proving each count would be admissible to prove each of the other counts[; and (3)] whether the crimes are interwoven.

*Corley*, 584 So. 2d at 772.

¶49.　Here, the record reflects that the injuries to Drew and Anna likely occurred sometime between twenty-four and thirty-six hours apart. Both medical experts concluded that the injuries were "recent." The record is also clear that Johnson was home alone with all three children on April 29, 2020, the day both incidents occurred. Additionally, both of Johnson's counts share the underlying act of child abuse and "involve too many similar factors when viewed together, to be anything but clearly linked and part of the same common scheme or plan." *Rushing v. State*, 911 So. 2d 526, 536 (¶19) (Miss. 2005). As the trial court ruled:

> [T]hese two events occurred, while maybe not simultaneously to each other, but at basically the same time, the same place, and involving the same people constituting a series of acts that are connected together, which is exactly [what] is contemplated by the multi-count statute.

We find no reversible error or abuse of discretion.

## CONCLUSION

¶50.　Johnson abandoned his motion to sever the counts against him when he failed to pursue his motion to a hearing and decision. As such, he waived the issue on appeal. Notwithstanding Johnson's waiver, the trial court was within its discretion to deny Johnson's motion to sever. Therefore, we find that the trial court did not abuse its discretion and affirm

Johnson's convictions and sentences.

¶51.    **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, LAWRENCE, EMFINGER, WEDDLE AND ST. PÉ, JJ., CONCUR.**